Filed 5/15/14  P. v. Nanez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>FRANK MATTHEW NANEZ,<br><br>    Defendant and Appellant. | F064574<br><br>(Super. Ct. No. VCF225307A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Kathryn T. Montejano, Judge.

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found defendant Frank Matthew Nanez guilty of first degree murder (Pen. Code,[1] § 187, subd. (a)), two counts of attempted murder (§§ 187, 664), and shooting at an inhabited house (§ 246). The jury also found gang enhancement allegations to be true (§§ 186.22, subd. (b), 190.2, subd. (a)(22).)

On appeal, Nanez contends the trial court erred by denying his motion to bifurcate trial of the gang enhancements and by failing to give, sua sponte, a jury instruction on accomplice testimony in relation to witness Chris Tienda. He also contends that the prosecutor engaged in misconduct that rendered his trial fundamentally unfair and that cumulative trial errors require reversal.

In addition, Nanez requests a correction to the abstract of judgment. The People agree the abstract of judgment should be corrected as requested by Nanez, and they also point out another discrepancy that requires correction.

We will order the trial court to correct the abstract of judgment to reflect that the term for count 4 is stayed under section 654 and the terms for counts 2 and 3 are to be served consecutively. Otherwise, we affirm.

### *FACTS AND PROCEDURAL HISTORY*

Around 7:30 p.m. on July 31, 2009, Visalia police officers were dispatched to a house on South Santa Fe Avenue on a reported shooting. Officer Brian Ferrara went to the front door and saw Angel Guzman lying on his back inside the threshold of the doorway. Cristian Rodriguez held Guzman's head up off the ground. Ferrara saw blood all around Guzman's head; he had been shot in the back of the head. Guzman was taken to the hospital by ambulance, and he died the next day.

---

[1] Subsequent statutory references are to the Penal Code unless otherwise specified.

Officer Blake McEwen took an initial statement from Cristian.[2] Cristian said the shooter was named Frank, whom he knew because they had gone to school together. He described Frank as a Hispanic male adult, approximately 19 years old, six feet tall, thin to medium build, with a dark complexion and short, black hair. Cristian saw Frank pull out a small caliber handgun and begin to shoot at him and his two friends. There was another man with Frank. Cristian described him as a Hispanic male adult, approximately 19 years of age, wearing a white T-shirt, about five feet five inches tall, thin build, with a goatee and light complexion. Cristian had seen him often in the neighborhood walking with his skateboard.

Sergeant Curtis Brown recorded an interview with witness Arnulfo Rodriguez on the day of the shooting. Arnulfo, who is not related to Cristian, said he had just returned from the store with Guzman and Cristian, and they were standing in front of Guzman's car. Arnulfo saw two guys walking—one was wearing a red shirt and the other was wearing a white tank top. He recognized them but did not know their names. The one in the red shirt fired five or six shots. Arnulfo saw the gun; it was black and appeared to be a semiautomatic. Arnulfo ran to the backyard and Cristian and Guzman ran to the front door of the house. About two hours after the shooting, officers showed Arnulfo a photographic lineup, and he identified Nanez as the shooter. He said the shooter was wearing red and he recognized him from school. He said the shooter ran with Northerners. Arnulfo had never seen the man in the white tank top before.

Police found five spent shell casings with the marking "W-W .32 auto" in front of the house where Guzman was shot. They found three holes in the front door screen and one hole in the frame that were consistent with bullet strikes. There were also two marks consistent with bullet strikes on the exterior of the house near the front door. A bullet

---

[2]    Because some of the witnesses share last names with other witnesses, we refer to them by their first names. No disrespect is intended.

3.

was found inside the house in the living room that matched the bullet recovered from Guzman. A neighbor later found another shell casing in his flowerbed.

On December 18, 2009, the Tulare County District Attorney filed an information against Nanez and Michael Bobby Davis, charging both defendants with murder, two counts of attempted murder, and shooting at an inhabited dwelling. It was alleged, among other things, that the murder and attempted murder charges were punishable by life in prison and were subject to sentencing under section 186.22, subdivision (b)(5).

Codefendant Davis reached a plea agreement with the district attorney on May 23, 2011. Davis agreed to testify in all court proceedings related to the murder of Guzman. In exchange, he would be allowed to enter a plea of guilty or no contest to voluntary manslaughter and attempted voluntary manslaughter and to admit the gang special allegations. All other pending charges would be dismissed and he would receive a sentence of 21 years in state prison.

On July 18, 2011, the district attorney filed a fourth amended information against Nanez. He was charged with the murder of Guzman (§ 187, subd. (a); count 1), the attempted murder of Cristian (§§ 187, 664; count 2), the attempted murder of Arnulfo (§§ 187, 664; count 3), and shooting at an inhabited dwelling (§ 246; count 4). For count 1, it was alleged that Nanez intentionally killed Guzman while Nanez was an active participant in a criminal street gang and the murder was carried out to further the activities of the criminal street gang (§ 190.2, subd. (a)(22)). For all counts, it was alleged that Nanez or a principal personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), the intentional discharge of the firearm caused death or great bodily injury (*id*., subd. (d)), and Nanez committed the offense for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)).

In his trial brief filed on August 10, 2011, Nanez made a motion to bifurcate the gang allegations. He argued that gang evidence was not necessary to prove identity or motive and was "nothing more than evidence of criminal disposition." On the same day,

4.

the trial court heard argument on various motions in limine and the motion to bifurcate. The court denied the motion to bifurcate.

A jury trial began on August 22, 2011.

*Prosecution's case*

Cristian testified that Guzman was his cousin and they lived together at the house on South Santa Fe where the shooting occurred. He identified Nanez as the shooter. On the evening of the shooting, Cristian was standing outside his house in the driveway talking with his friend, Arnulfo, and Guzman. He was wearing baby blue and waiting for his brother to pick him up for work. He saw two people approaching northbound on Santa Fe. Nanez was wearing a red shirt and the other man was wearing a white shirt. Cristian thought the one in white had a skateboard, but he was not sure. He had seen the man in white in the area with a skateboard, but he did not know his name. At first, Nanez and the other man were walking and, as they got closer, they started running. They ran side by side, with Nanez on the side closer to the house. Cristian saw Nanez reach for a gun from his waist. Cristian heard a popping noise and he ran inside the house. He did not hear anyone say anything. Guzman also ran toward the house, and Arnulfo ran to the backyard. After he was inside the house, Cristian saw Guzman lying down in the living room bleeding from his head. Cristian covered the wound and called 911.

Cristian spoke to several officers after the shooting and consistently identified Nanez as the shooter. He recognized Nanez immediately because they attended the same middle school and high school and had classes together. He also saw Nanez walk by all the time in the neighborhood. Nanez associated with Norteños. Cristian was not a gang member, but he hung out with Sureños. Arnulfo was a gang member of Loco Park, a subset of the Sureños. Guzman was not involved in gangs. Cristian did not recognize the man with Nanez as a gang member. He thought he "looked more like a skater." In the past, Cristian had never had any problems with either Nanez or the other man. He had no reason to think Arnulfo had any problems with Nanez. Between the time he called 911

5.

and the time the officers arrived, Cristian did not have time to talk to Arnulfo, and he and Arnulfo have not talked about the shooting since then. Arnulfo moved to Arizona about a month or two after the shooting.

During cross-examination, Cristian recalled that he told Sergeant Brown he did not see the gun. Defense counsel asked, "You didn't actually see Mr. Nanez fire a weapon; correct?" Cristian responded, "No, sir."

Arnulfo was a recalcitrant witness called by the prosecution. He attempted to "plead the Fifth," explaining, "I'm not saying nothing, that's what I'm saying" and "I don't remember nothing that day." He admitted he had "LP" for Loco Park tattooed on his right arm. He also agreed that when he talked to police officers on the night Guzman was shot, he had been honest with them.

Cristian's brother, Ernesto Rodriguez, testified that, at around 7:30 on July 31, 2009, he went to pick up Cristian to go to work. About half a block from Cristian's and Guzman's house, he heard shots. He saw two men running and shooting. He saw them from the back, and he did not remember what they were wearing. Ernesto stopped and Cristian told him, "'Follow them. Angel's been shot.'" He saw a white car waiting for the men around the corner. Ernesto saw the men run toward the white car and then saw the car drive east on Sequoia Avenue, but he did not see the men get into the car. A neighbor told him she saw two people running and one got in the white car and the other one ran away.

Another neighbor, who lived on Sequoia Avenue, testified that she heard gunshots and then saw a man running from a house or between houses and then he ran along Tipton Street.

Davis, who had been Nanez's codefendant, was 17 years old at the time of the shooting. He testified that he had been a Norteño for about three or four years, but he was not a gang member at the time of trial. He was labeled a dropout and was in protective custody. He started out as a Norteño in Tulare and then he moved to Visalia

6.

and still hung around Norteños. His "turf" was Tulare, but the Visalia Norteño gang accepted him as one of their own. He knew that Nanez was a Norteño, but he did not know him that well. Nanez had a tattoo of "NSV" on his chest. He agreed that "scraps" is a derogatory term for Southerners or Sureños. He had not seen an "SK" tattoo on Nanez.

Davis was charged with the murder of Guzman, but he was never accused of being the shooter. When he was arrested the day after the shooting, Davis told the officer, "'I know why I'm here. I'm here for Frank.'" He also said they could test him for gunpowder because he was not the shooter. Davis later entered a plea agreement in which he agreed to a 21-year prison term.[3]

Davis testified that on July 31, 2009, he was "looking to find some marijuana." He went to Randy Perkins's house near Laurel Avenue and Tipton Street, but Perkins was not there, so he called other people to see if they had marijuana. He was at the corner of Santa Fe and Laurel talking on his cell phone when he heard car doors. He turned around and saw Nanez and a white car pulling away. Nanez was wearing a red shirt. Davis was wearing a white tank top.

Davis asked Nanez if he could find marijuana and Nanez said, "'Yeah, right after I hit up the scraps.'" Davis told him, "'All right. I'll go with you.'" He thought Nanez "was just going to fight." Nanez did not say anything about shooting. Nanez and Davis started jogging north on Santa Fe, and then Nanez reached in his waistband, pulled out a gun, and started shooting. Davis said the gun was medium sized, "like a .22 but a little bigger." Davis had seen Guzman from time to time, but he did not know him. He did not know Cristian or Arnulfo either. He had no problems with any of them. Nanez fired six

---

**3** On cross-examination, Davis stated that prior to reaching a plea agreement, he was facing a possible sentence of life without the possibility of parole.

or seven shots while he was running. Davis continued running with him. They ran north on Santa Fe and then Davis followed Nanez as he turned right onto Sequoia Avenue.

Davis saw the white car he had seen at Santa Fe and Laurel a few minutes earlier. Chris Tienda was in the car and Chris's brother, Jesus,[4] was driving. Davis had hung out with Chris on occasion but did not consider him a friend. Nanez got into the backseat of the car. Davis tried to get in the car, but the driver told him he could not get in. Davis was shocked that they were leaving him. He ran east and turned south onto Tipton Street toward Perkins's house, and the white car turned north onto Santa Fe. At Perkins's house he saw Perkins walk into his house. Davis told Perkins what happened and Perkins told him he could not stay there. He walked to his friend Justin Brown's house, and then his cousin picked him up and took him home.

On cross-examination, Davis admitted that he initially told Sergeant Brown that he had nothing to do with the shooting. He said he had only witnessed the shooting and he was wearing a yellow shirt that day while Chris was wearing a white shirt. Davis agreed that he told the police, "'If I give you some names, will you let me go?'" He asked the police if anyone was saying that he pulled the trigger, and he said he had seen the gun before at Perkins's house. In a subsequent interview with an investigator from the district attorney's office, Davis said he thought he recognized one of the shooting victims as Stomper, a person he had trouble with back in juvenile hall.[5] Davis also agreed that on the day of the shooting he called Biancha Alles.

Chris Tienda testified that on July 31, 2009, he was at home with his friend, Jacob. His brother, Jesus, was at work that day and Nanez was with him for part of the day.

---

**4** Davis did not know Chris's brother's name, but he later identified a photo of Jesus Tienda as the driver of the car.

**5** Davis testified that Stomper was LP or Loco Park. He also testified that he no longer believed the person he saw in front of Cristian and Guzman's house was Stomper.

Chris initially told a police officer that on the day of the shooting, he and Nanez were playing pool the whole day and then a friend in a van pulled up and asked Chris for help. Later in the police interview, Chris said he and Nanez were not together all day, as Chris left his house around 6:00 or 7:00 p.m. to go to the drive-thru at McDonald's. After an officer said he was going to check the video at the McDonald's drive-thru, Chris said he went to Taco Bell. He told the police Nanez left his house at around 7:00 p.m. He denied being with Nanez at 7:30 p.m. He did not admit that he was a Norteño gang member but agreed that he associated with Northerners. Chris and Nanez were arrested on August 11, 2009, and they were put in cells next to each other.

Sergeant Brown testified that, contrary to his trial testimony, Chris told him that Jesus was home the entire day on July 31, 2009. On the witness stand, Chris did not remember that an officer warned him about "throwing all your chips with Frank by saying you were with him the whole time." According to Sergeant Brown, however, he told Chris he was "pretty much throwing all his chips in with Frank." At that point, Chris changed his story, saying that Nanez left around 7:00 p.m. and he (Chris) left to go to McDonald's. The police monitored Chris's and Nanez's communication when they were in custody together. At one point, Nanez asked Chris if the police saw Jesus in the car, and Chris indicated that the police had all three of them in the car. Sergeant Brown also testified that as of August 10, 2011, Nanez had a tattoo of "SK" on his left elbow.

Another officer testified about a probation search of the bedroom of Nanez's brother, Andy. The search was conducted on March 18, 2010, and three letters addressed to Andy and signed by Nanez were discovered. The officer read part of a letter by Nanez dated February 11, 2010, to the jury:

> "Bro, a Norteno sets goals for others—for himself while set behind the walls is to establish a positive attitude for himself. [¶] … [¶] Once a true believer of Raza gets a [full] understanding/meaning of our cause, a new character flame kicks in. [¶] … [¶] It's a pure cause, bro. At times we may feel hopeless, going through trials and hardships in our hearts. Andy,

9.

we are soldiers, we are Nortenos at heart. Let's not let anything get to us, rather learn from it. [¶] … [¶]  Better ourselves and continue further in our advancement.  In order to do so, our advancement demands change. [¶] … [¶]  I love you, little boy.  If they give me the death penalty, I hope all goes well for you out there, for these are my sincere wishes.  [¶] … [¶] Because the path of a warrior/Norteno ain't a easy one, but a righteous one. [¶] … [¶]  With this said, I step down the same way I step in with my [utmost] love and respect in full."

Officer Erica Martinez, the first officer to interview witnesses after the shooting, was also called to testify.  She dictated a report of her witness interviews over the phone and did not review the report later.  She spoke to Arnulfo first.  According to her report, he told her he had been standing next to Guzman when two men approached northbound on Santa Fe.  He described one as a Hispanic male adult, light complected, 17 to 18 years of age, with short, black hair and wearing a white tank top and blue jeans.  Arnulfo described the other man as a Hispanic male adult with a dark complexion, short, black hair, wearing a red T-shirt and black pants.  He said the one with the white shirt had the gun.  Upon hearing shots fired, Arnulfo ran into the house and, when he turned around, the victim was lying in the doorway.  Arnulfo "said somebody, one of the two yelled, 'What's up scraps?'"  He did not see their faces.  Martinez next interviewed Cristian. Cristian did not mention red or white shirts.  He recognized one of the men, whom he knew as Frank.

Detective Luma Fahoum testified as a gang expert.  She explained that "NSV" stands for North Side Visalia, a subset of the Norteños or the Northerners, a criminal street gang.  Norteños identify with the color red.  One of their rivals is the Sureños or Southerners.  Sureños identify with the color blue.  Loco Park is the largest subset of Sureños in Visalia.  Fahoum described the rivalry between Norteños and Sureños as "a violent, vicious rivalry, full of hatred over territory and color" "[b]oth ways."  "SK" stands for Sureño killer or scrap killer and "NK" stands for Norteño killer.  The area where the shooting occurred was a predominately Norteño neighborhood.

10.

Fahoum described three predicate offenses committed by Norteño gang members. On July 17, 2007, Victor Tovar and Benjamin Solis approached the residence of two Sureño gang members and opened fire into their bedroom windows. The intended victims were not struck, and Tovar was convicted of attempted murder. On August 16, 2007, an Asian man and an Asian woman were approached by a group of known Norteños. They asked the man where he was from and whether he was a gang member. The man used the word "'cuz'" and a fight ensued between him and Norteño gang member John Fernandez. The man tried to run away, and he was shot and killed by another gang member, Brandon Flores. Both Fernandez and Flores were convicted and found to have acted for the benefit of a criminal street gang. On February 17, 2007, a gang member, Luis Ortega, committed a driveby shooting at the residence of a Sureño who had insulted Ortega's haircut at school.

Based on review of police contact information, booking records, and other documentation, Fahoum opined that Nanez, Chris, and Jesus were all active Norteño gang members. Davis had been an active Norteño gang member but was a dropout at the time of trial. Arnulfo was an active Sureño gang member, Loco Park subset, and Cristian was a Sureño associate at the time of the shooting. Guzman was not affiliated with a gang. Given the hypothetical of two Norteño gang members shooting at a group that includes a Sureño gang member and a Sureño associate in daylight and in Norteño territory, it was Fahoum's opinion that the offense would be for the benefit of a criminal street gang.

***Defense***

The defense called Officer Sonya Payne, Biancha Alles, and investigator Eric Velasquez as witnesses.

Payne responded to the reported shooting on July 31, 2009. Witnesses told her they had seen two men run into a house on Laurel, later identified as Perkins's house. Payne saw Gloria McClintock, Perkins's mother, in front of the house and asked her if

11.

she had seen anyone run in. McClintock responded that she had not. Perkins emerged from the backyard of the house and Payne spoke to him. At first, Perkins denied running. Then he said he was running southbound across the street to his house to get some water. His friend, Justin, also ran into the backyard. Perkins saw a Hispanic male about 25 to 30, wearing a white tank top and dark jeans; he was sweaty. Perkins and Justin were detained. A backpack was found in the backyard that contained methamphetamine and marijuana.

Alles lives on the corner of Tipton at Laurel, across the street from Perkins's house. She was at home on July 31, 2009, and she heard gunshots. She spoke to Davis on the phone that day, but she did not remember who called whom. She testified, "He said, 'I shot a scrap.'" He sounded shaky and scared.

At the time of trial, Alles had known Davis for a couple years and she had known Nanez since she was eight. She had not spoken to Davis since the phone call, but she did write him a letter. When she wrote Davis, she did not tell him she was going to lie to protect Nanez.

On cross-examination, Alles agreed that Nanez was a friend she grew up with and she visits him in jail. She told an investigator from the district attorney's office about what Davis said on February 9, 2010. She had not spoken to any police officers before that. Alles told the investigator that she heard from Nanez's mother that he needed three people to testify for him and she was going to testify for him.[6] She also told the investigator that Davis said he was by himself during the shooting.

---

[6] In addition, the following portion of a letter written by Nanez and dated February 12, 2010, was read to the jury during the prosecution's rebuttal:

> "'No, Browner ain't going to testify. Just Chris [presumably referring to Cristian]. What did Texas say about Tienda? Yeah, I need three people, Tienda, Silly, and Biancha. I just need Silly to come see me so I can talk to her.'"

According to Fahoum, Arnulfo is known as Browner.

Velasquez was an investigator for the district attorney's office. He interviewed Davis on September 30, 2010. Davis told him that he recognized Arnulfo as Stomper, whom he knew from juvenile hall. Davis had a problem with Stomper, who was a Sureño. Davis described the gun used in the shooting. He said it was a .32-caliber, gunmetal gray, and he had seen it before at Perkins's house. Davis had seen the gun fired when some people, including Justin, were shooting bottles in Three Rivers. Davis told Velasquez he received a letter from Alles in which she wrote that she was upset with him because he told the police about Nanez's involvement. She wrote that she was going to lie and say it was Davis. Davis did not provide the letter.

The defense theory was that it was Davis who shot and killed Guzman. In his opening statement, defense counsel suggested that Nanez was about to meet up with Chris when Davis approached him about getting marijuana. Davis then saw a person he thought was Stomper, with whom he had trouble in juvenile hall, and suddenly started shooting. Nanez was scared, ran and got into Chris's car, and would not let Davis get in the car. In his closing argument, defense counsel pointed out that Arnulfo first told an officer that the man wearing white was the shooter. Counsel suggested that Cristian only thought Nanez had the gun because he recognized Nanez, not because he actually saw the gun. Davis had a motive and also had detailed knowledge about the weapon used. Davis claimed to have received a letter from Alles in which she wrote that she was going to lie, but he was not able to produce the letter. Finally, defense counsel argued that, if the shooting was planned, it did not make sense that Nanez would go by foot rather than drive by. It made more sense that Davis simply acted impulsively when he saw the person he thought was Stomper.

### Verdict and sentence

The jury reached a verdict on August 30, 2011. It found Nanez guilty of all four counts and found true all enhancement allegations.

13.

The sentencing hearing took place on January 27, 2012. The court imposed a term of life without the possibility of parole, plus a consecutive 25 years to life pursuant to section 12022.53, subdivision (d), and a minimum parole eligibility of 15 years pursuant to section 186.22, subdivision (b)(5), for count 1. The court imposed a term of life with a minimum parole eligibility of 15 years pursuant to section 186.22, subdivision (b)(5), plus a consecutive 25 years to life pursuant to section 12022.53, subdivision (d), for each of counts 2 and 3, with the terms to run consecutively. For count 4, Nanez was sentenced to 15 years to life pursuant to section 186.22, subdivision (b)(4), plus a consecutive 25 years to life pursuant to section 12022.53, subdivision (d), the term to be stayed pursuant to section 654.

## DISCUSSION

### I. Motion to bifurcate

Nanez contends the trial court violated his federal due process rights when it denied his motion to bifurcate trial of the gang enhancements.

#### A. Background

Prior to trial, Nanez moved to bifurcate trial of the gang allegations. He argued:

> "Much of the prosecution's case against Mr. NANEZ rests on his alleged participation in the North Side Visalia … set and the accusation that the group is a criminal street gang. The prosecutor will undoubtedly place heavy emphasis on Mr. NANEZ's supposed gang connections to pre-condition jurors into believing that the defendant is criminally disposed and therefore more likely to commit crimes. Disproportionate use of this gang evidence to prove a straightforward murder case would create a trial atmosphere which would deprive Mr. NANEZ of fundamental fairness.

> "… The danger … is that the jury will rely on the expert opinion [offered to prove the gang enhancements] not only for determining the truth of the gang allegation but also for determining Mr. NANEZ's guilt or innocence of the underlying offense. Such a danger is, of course, added to the already prejudicial nature of gang evidence which invites jurors to conclude that a defendant is criminally disposed."

14.

Nanez offered contradictory reasons for why gang evidence was unnecessary to prove motive in the underlying murder and attempted murder charges. First, he asserted there was "no indication that there is a gang related motive for the crime, since each of the victims denies membership in any criminal street gang. None of the typical reasons prosecutors use to justify the introduction of gang evidence applies in this case." Later, he claimed, "The motive for the murder is self-evidently gang related. A random act of violence committed in broad daylight complete with the shouting of gang slogans does not require an expert to establish motive. In other words, jurors do not need a lengthy lecture on Northern gang structure to determine whether there was a gang motive for the murder."

He also argued that gang evidence was unnecessary to establish identity and was not relevant to the issues of opportunity, preparation, plan, knowledge, absence of mistake, or accident.

At the hearing on the motion to bifurcate, the prosecutor opposed bifurcation, asserting that the gang evidence was extremely relevant to the underlying crimes: "This whole case is about gangs. If we were to bifurcate it, these issues would still come up." He told the court there was evidence that Nanez was a Norteño, he said to Davis before the shooting that "he was going to, 'Hit up scraps,'" and the victims were aligned with the Sureños. Thus, the prosecutor argued, "Under [Evidence Code section] 1101[, subdivision ](b), the evidence would … come in anyway under motive."[7] The gang evidence would also be relevant to intent, "because if you just have a random killing, … it's hard to argue why this happened." The prosecutor explained, "In the gang context, it

---

**7**     Evidence of a person's character is not admissible to prove the person's conduct on a particular occasion. (Evid. Code, § 1101, subd. (a).) Under Evidence Code section 1101, subdivision (b), however, evidence that a person committed a crime or other act (in this case, being an active member of a criminal street gang) is admissible if "relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident …) other than his or her disposition to commit such an act."

15.

makes sense and clarifies the gang issue. They're enemies of each other, and [Nanez] is running by a house shooting at them. The intent can be inferred as to kill."

The court denied the motion to bifurcate, stating:

> "All right. The Court is going to make its record as to this particular aspect. That is that the Court has taken into consideration the potential of this particular evidence. The Court has engaged in the weighing and the balancing of the evidence to determine if the prejudicial effect overrides the probative value.

> "To be clear, this type of evidence is prejudicial. It's very relevant. It does—if what's being proffered is accurate. It speaks to certain elements of the offense, and the Court finds that the probative value outweighs the prejudicial effect and not bifurcate that particular evidence."

## B.      Analysis

In *People v. Hernandez* (2004) 33 Cal.4th 1040, 1048-1050 (*Hernandez*), the California Supreme Court recognized that a trial court has authority to bifurcate the trial of gang enhancements from the trial of underlying offenses in the exercise of its broad discretion. The court suggested that, in some cases, the evidence of predicate offenses may be unduly prejudicial or the "gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Id*. at p. 1049.) In such cases, bifurcation would be warranted. (*Ibid*.)

On the other hand, the court observed:

> "[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.]" (*Hernandez, supra*, 33 Cal.4th at pp. 1049-1050.)

16.

Further, "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation" based on considerations of judicial efficiency. (*Hernandez*, *supra*, 33 Cal.4th at p. 1050.) Analogizing bifurcation to severance, the court noted that a unitary trial avoids the increased expenditure of funds and judicial resources that would be required with bifurcation. (*Ibid.*)

In *Hernandez*, the Supreme Court found the trial court acted within its discretion in denying the defendants' request to bifurcate. During a robbery, a defendant demanded a dollar from a victim and told her she did not know who she was dealing with, she was dealing with "'Hawthorne Little Watts.'" Two defendants were charged with robbery with a gang enhancement allegation. At trial, a gang expert testified that Little Watts was the largest Hispanic gang in Hawthorne and that gang members identify their gang during the commission of crimes to gain respect and instill fear. (*Hernandez*, *supra*, 33 Cal.4th at pp. 1045-1046.) The Supreme Court concluded that much of the gang evidence was relevant to the charged offense as the defendant himself "injected his gang status into the crime" by identifying himself as a gang member and attempting to use that status to demand money from the victim. (*Id*. at pp. 1050-1051.) Further, "[a]ny evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt." (*Id*. at p. 1051.) Accordingly, the court concluded there was no abuse of discretion in the trial court's refusal to bifurcate.

"The People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.' [Citation.] '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.)

17.

Here, the evidence showed Nanez was a Norteño gang member, he referred to hitting up "'scraps'" before the shooting, he wore red, he was accompanied by another Norteño gang member, he shot at a group of three men that included one Sureño gang member and one Sureño associate, someone said "'What's up scraps?'" and the shooting occurred in a predominately Norteño neighborhood. The gang evidence—including explanation of the violent rivalry between the Norteños and Sureños, the meaning of the term "scrap," and the gang member status of Nanez, Davis, and the victims—was relevant to show Nanez's motive and intent. As the prosecutor argued, this otherwise random shooting only makes sense in the gang context. Indeed, Nanez acknowledges, "It was appropriate for the trial court to permit the prosecutor's gang expert to explain the significance of the red clothing, the meaning of the term 'scraps,' and relevant history of dealings between the Nortenos and Surenos."

Nevertheless, Nanez claims the trial court erred by denying the motion to bifurcate because this allowed the jury to hear evidence of predicate offenses committed by other gang members. He argues the predicate offenses in this case "posed a significant danger the jury would use it to find [Nanez] had a propensity to commit violent acts." We disagree. The gang expert described three crimes committed by Norteño gang members. She provided the names of the defendants in those cases and there was no evidence Nanez was involved in any of those crimes. As a result, there was no risk the jury would have viewed the predicate crimes as "offenses for which a defendant might have escaped punishment." (*Hernandez*, *supra*, 33 Cal.4th at p. 1051.) Further, although the predicate offenses were violent and involved firearms, they were not more inflammatory than the charges underlying this case. Nanez was charged with the murder of a person with no gang ties as he stood in front of his house, along with the attempted murder of two Sureño associates. Given the nature of the charges against Nanez, the predicate offenses were not unduly prejudicial. Nanez suggests that the two predicate offenses that involved shooting at Sureño gang members "created an unrealistic picture of a one-sided use of

18.

force by Nortenos against Surenos." The gang expert, however, explained that the violent and vicious rivalry between the Norteños and Sureños ran both ways, and we do not believe the jury was given the false impression that only Norteños use force in the rivalry between the two gangs. Nanez also argues that the predicate offense involving the murder of a man who used the word "'cuz'" "must have horrified jurors, by depicting Nortenos as people who would murder a non-gang member they encounter on the street for virtually no reason at all." Yet, the charged case also involves a murder victim who was not involved in gangs. Under these circumstances, there was no abuse of discretion in the trial court denying the motion to bifurcate trial of the gang enhancement allegations.

Nanez relies on *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*) for his claim that the trial court's failure to bifurcate was a violation of due process. In *Albarran*, the Court of Appeal explained:

> "To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is ... whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citation.]' [Citation.]" (*Albarran*, *supra*, 149 Cal.App.4th at pp. 229-230.)

In *Albarran*, the defendant was convicted of attempted murder, shooting at an inhabited dwelling, and attempted kidnapping for carjacking. The jury also found gang enhancement allegations to be true. The defendant filed a motion for a new trial, asserting there was insufficient evidence to support the gang enhancements and the admission of irrelevant and highly inflammatory gang evidence warranted a new trial on the underlying charges as well. The trial court granted the motion for new trial as to the

gang allegations but denied a new trial on the underlying offenses. (*Albarran*, *supra*, 149 Cal.App.4th at p. 217.)

On appeal, the defendant argued the trial court should have granted his new trial motion as to the underlying offenses. The Court of Appeal agreed, concluding that the gang evidence was not relevant to the underlying charges and, given the highly inflammatory nature of the gang evidence, admitting the gang evidence was not harmless. (*Albarran*, *supra*, 149 Cal.App.4th at p. 217.) The court specifically found the gang evidence was not relevant to the issue of motive and intent, noting that "the motive for the underlying crimes … was not apparent from the circumstances of the crime" and, in the final analysis, the *only* evidence to support a gang motive was the fact of the defendant's gang affiliation. (*Id*. at p. 227.) The irrelevant gang evidence presented at trial included references to the Mexican Mafia, "a violent prison street gang," threats to police officers, and crimes by other gang members. (*Id*. at pp. 220, 230.) Under the facts of the case, the *Albarran* court held:

> "This case presents one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair. Given the nature and amount of this gang evidence at issue, the number of witnesses who testified to [the defendant's] gang affiliations and the role the gang evidence played in the prosecutor's argument, we are not convinced beyond a reasonable doubt that the error did not contribute to the verdict." (*Albarran*, *supra*, 149 Cal.App.4th at p. 232.)

Here, in contrast, the bulk of the gang evidence *was* relevant to motive and intent in the underlying charges, as Nanez concedes. Even with respect to the predicate offenses, two of the offenses involved Norteño violence against Sureños and were, therefore, relevant to show the rivalry between the gangs. Moreover, the evidence was not so prejudicial that the jury might have been swayed to convict Nanez regardless of his actual guilt. As we have discussed, the predicate offenses were no more inflammatory than the charged offenses in this case. Finally, the jury was given a limiting instruction

on the use of evidence of gang activity and was specifically instructed, "You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." We presume the jury followed this instruction. (*People v. Pearson* (2013) 56 Cal.4th 393, 414.) For all of these reasons, we conclude there was no due process violation in admitting the gang evidence in this case.

## II. *Jury instruction on accomplice testimony*

Section 1111 provides:

> "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

Here, the jury was given CALCRIM No. 335, instructing that Davis was an accomplice as a matter of law and, therefore, the jury could not convict Nanez based on Davis's testimony alone.[8]

---

[8] Jury instruction No. 16 given to the jury provided:

> "If the crime of Murder was committed, then Michael Davis was an accomplice to that crime.

> "You may not convict [Nanez] of Murder based on the statement or testimony of an accomplice alone. You may use the statement or testimony of an accomplice to convict [Nanez] only if:

> "1. The accomplice's statement or testimony is supported by other evidence that you believe;

> "2. That supporting evidence is independent of the accomplice's statement or testimony;

> "AND

> "3. That supporting evidence tends to connect [Nanez] to the commission of the crime.

> "Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that [Nanez] is guilty of the charged crime, and it does not need to support every fact about which the witness testified. On the other

On appeal, Nanez contends the trial court also had a sua sponte duty to give CALCRIM No. 334, instructing the jury that it must determine whether prosecution witness Chris Tienda was an accomplice.[9] We disagree.

hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect [Nanez] to the commission of the crime.

"Any statement or testimony of an accomplice that tends to incriminate [Nanez] should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

[9]    Nanez suggests the trial court should have given an instruction such as the following variation of CALCRIM No. 334:

"Before you may consider the statement or testimony of Chris Tienda as evidence against [Nanez] regarding the crimes with which he is charged, you must decide whether Chris Tienda was an accomplice to those crimes. A person is an *accomplice* if he or she is subject to prosecution for the identical crime charged against [Nanez]. Someone is subject to prosecution if he or she personally committed the crime or if: [¶] 1. He or she knew of the criminal purpose of the person who committed the crime; and [¶] 2. He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime.

"The burden is on [Nanez] to prove that it is more likely than not that [Chris] Tienda was an accomplice.

"An accomplice does not need to be present when the crime is committed. On the other hand, a person is not an accomplice just because he or she is present at the scene of a crime, even if he or she knows that a crime will be committed or is being committed and does nothing to stop it.

"A person may be an accomplice even if he or she is not actually prosecuted for the crime.

"If you decide that Chris Tienda was not an accomplice, then supporting evidence is not required and you should evaluate his statements or testimony as you would that of any other witness.

"If you decide that Chris Tienda was an accomplice, then you may not convict [Nanez] based on his or her statements or testimony alone. You may use the statement or testimony of an accomplice to convict [Nanez] only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's

"When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony.  [Citation.]  This includes instructing the jury that an accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence.  [Citations.]"  (*People v. Houston* (2012) 54 Cal.4th 1186, 1223.)  An accomplice is "one who is liable for prosecution for the *identical offense* charged against the defendant" as an aider and abettor or as part of a conspiracy.  (§ 1111, italics added; *People v. Houston*, *supra*, at p. 1224.)  An accomplice must have guilty knowledge and intent with regard to the commission of the crime.  (*Ibid.*)

In the present case, there was no substantial evidence that Chris was guilty of first degree murder or attempted murder.  There was no evidence that Chris knew that Nanez had a gun or that he intended to shoot a group of men.  In addition, Chris's testimony did not directly implicate Nanez.  Accordingly, the court had no sua sponte duty to give CALCRIM No. 334 instructing the jury to determine whether Chris was an accomplice.

Moreover, even assuming the trial court should have given an accomplice witness instruction regarding Chris, there was no harm.

statement or testimony; and  [¶]  3. That supporting evidence tends to connect [Nanez] to the commission of the crimes.

"Supporting evidence, however, may be slight.  It does not need to be enough, by itself, to prove that [Nanez] is guilty of the charged crimes, and it does not need to support every fact mentioned by the accomplice in the statement or about which the accomplice testified.  On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission.  The supporting evidence must tend to connect [Nanez] to the commission of the crime.

"Any statement or testimony of an accomplice that tends to incriminate [Nanez] should be viewed with caution.  You may not, however, arbitrarily disregard it.  You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

23.

"A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is 'sufficient corroborating evidence in the record.' [Citation.] To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. [Citations.] '"[T]he corroborative evidence may be slight and entitled to little consideration when standing alone." [Citation.]' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 562-563.)

Here, there was corroborating evidence in the form of witness identification from the two surviving shooting victims.

We also reject Nanez's claim that failing to instruct the jury to determine whether Chris acted as an accomplice "denied [him] his right to have every factual question decided by the jury" and violated the federal Constitution. He offers no authority or explanation to support this claim, and we fail to see how the omission of an accomplice instruction denied him his right to have the jury decide his guilt or innocence. Nanez does not assert, for example, that the jury was improperly instructed on the elements of the charged offenses.

## III. Prosecutorial misconduct

### A. Background

During trial, defense counsel twice moved for a mistrial based on prosecutorial misconduct. First, on August 24, 2011, after a noon recess, defense counsel asked for a mistrial arguing the prosecutor had "engaged in an intentional pattern of behavior attempting to prejudice the jury." He asserted that the prosecutor made disparaging remarks about defense counsel, referred to Nanez as "'that Norteno,'" questioned Davis about "the phrase scrap killer," and "subpoenaed Andy Nanez [to] court in order to kick him out of court." The court denied the request for a mistrial and "d[id] not see an assignment of misconduct." The court instructed the prosecutor to refer to Nanez as "Mr. Nanez or the defendant" in the future.

Second, on August 26, 2011, defense counsel moved for a mistrial and asked for an assignment of misconduct regarding the prosecutor's behavior at trial after the cross-examination of Alles. He argued, "His cross-examination of Miss Alles was an example of continually asking questions he knew to be objectionable [with] deliberate intent to prejudice the jury." On August 29, 2011, the court heard further argument on the issue and then ruled that the prosecutor's conduct in cross-examining Alles did not rise to the level of misconduct. The court stated: "The envelope was being pushed. Not very gently. The Court did sustain the objections and I'm convinced the jury based on the instructions received the appropriate evidence."

Now, on appeal, Nanez raises the same alleged misconduct and claims the prosecutor's behavior requires reversal. He focuses on two alleged types of conduct: (1) "Statements and actions by the prosecutor that denigrated [Nanez] or his counsel in the presence of the jury" and (2) "The unduly argumentative cross-examination of defense witness Bianca Alles."

### B. Legal standards

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)

In general, a defendant must make a timely request for assignment of misconduct and admonition of the jury in order to preserve a claim of prosecutorial misconduct for

appeal.  (*People v. Young* (2005) 34 Cal.4th 1149, 1184-1185.)  To prevail on a misconduct claim, the defendant must show prejudice.  (*People v. Fields* (1983) 35 Cal.3d 329, 363.)

### C.      Alleged misconduct

#### 1.      Statements and actions about Nanez and his counsel

Nanez describes the following conduct as denigrating him or his defense counsel.

During questioning of Cristian, the prosecutor referred to Nanez as "this Norteno." He asked, "You would openly hang out with Surenos when this Norteno would see that; is that correct?" and "And you have seen this Norteno here, [Nanez] walking by your house with other Nortenos?"

During questioning of Davis, the prosecutor asked if Davis was aware that Nanez "ha[d] a tattoo of SK for scrap killers."  Defense counsel objected for lack of foundation and the court sustained the objection.  The prosecutor later asked Davis if he had heard the term scrap killer before.  He said he had.  The prosecutor asked, "That would be SK?" and Davis responded, "I think so, sir."  The prosecutor used the term scraps five times.

The prosecutor asked Davis how he knew Nanez.  Davis responded that he knew Nanez through his brother, Andy Nanez.  The prosecutor then asked if Davis made an arm motion, and Davis responded yes.  The prosecutor asked, "Where?" and Davis said, "He's sitting right there, sir."  At that point the prosecutor said, "Motion to exclude."

In his first request for a mistrial, defense counsel stated, "[The prosecutor] made disparaging references towards defense counsel, most notable was instructing me not to cough when I was near him in front of the jury."  The record shows that on August 23, 2011, *outside* the presence of the jury, the prosecutor said, "I would ask when you're standing over me, not to be coughing on me like you were."  Nanez does not point to anything in the record showing that the prosecutor made a similar comment in front of the jury.

We see no reversible prosecutorial misconduct. The People point out that defense counsel did not object to the prosecutor's reference to Nanez as "this Norteno" and, as a result, any claim of error is forfeited. Further, there was no dispute that Nanez was, in fact, a Norteño gang member. Defense counsel told the jury in his opening statement that Nanez was a gang member. Regarding the prosecutor's use of the terms "scraps" and "scrap killers," these terms were relevant because there was evidence that Nanez used the term scraps before the shooting and he had a tattoo that read "SK."

Defense counsel accused the prosecutor of subpoenaing Andy Nanez even though "he's not a witness to any issue in this case for the purposes of kicking him out." The prosecutor responded that Andy was a potential witness to explain the letters from Nanez found in Andy's room. The court considered the arguments and found that Andy was a potential witness:

> "As to the issue of Andy Nanez, what has been indicated to me is that Andy Nanez is in receipt of a letter … from someone believed to be [Nanez]. If the appropriate foundation was laid or if Andy Nanez was called as witness by [the prosecutor], it is conceivable he could testify as to the meaning of a Raza, Norteno, down for the cause. [¶] It appears to me he is a potential witness."

On the record before us, we have no reason to question the trial court's determination that Andy was a potential witness and no basis to conclude that the prosecutor subpoenaed Andy solely for an improper purpose.

Finally, regarding the allegation that the prosecutor instructed defense counsel not to cough on him in front of the jury, there is nothing in the record to indicate that this happened in front of the jury. The trial court addressed the allegation, stating, "I don't think I need to comment on the coughing. The Court observed that and indicated to [the prosecutor], it believes [defense counsel] was not trying to infect him." On this record, we cannot say that the prosecutor's comments about coughing disparaged defense counsel in front of the jury.

### 2. *Cross-examination of Alles*

During cross-examination of Alles, the prosecutor asked her about what she told the investigator on February 9, 2010, and gave her the investigator's transcript to review. The prosecutor asked about her telling the investigator that she did not hear any gunshots; rather, her mother heard the gunshots. Alles responded that she did not remember saying that. The prosecutor stated, "Convenient." Defense counsel objected and the objection was sustained.

On redirect examination, defense counsel asked if Davis admitted the shooting to her, and Alles responded yes. Defense counsel then asked, "Are you lying about this?" and she responded no. On recross-examination, the following occurred:

"Q. You're not lying about the other inconsistencies—

"[Defense counsel]: Objection, your Honor, argumentative.

"THE COURT: Overruled.

"THE WITNESS: No, I'm not lying.

"BY [the prosecutor]:

"Q. You're saying all kinds of different things here testifying.

"[Defense counsel]: Objection; argumentative.

"THE COURT: Overruled.

"BY [the prosecutor]:

"Q. Aren't you?

"[THE WITNESS:] No, I'm speaking the truth and what I remember.

"Q. No, you're speaking when you're trying to help your friend get off.

"[Defense counsel]: Objection; argumentative.

"THE COURT: Sustained, and stricken."

Defense counsel then questioned Alles again. On recross-examination, the prosecutor began his questioning:

"Q. That's the lie you're going with—

28.

"[Defense counsel]: Objection, your Honor, argumentative.

"THE COURT: Stop right now. Ask a question that's not objectionable.

"BY [the prosecutor]:

"Q. You wouldn't tell us if you're lying, of course; right?

"A. I would.

"[Prosecutor]: There's another lie. Nothing further.

"THE COURT: The statement of counsel will be stricken."

"An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony. Often it is apparent that the questioner does not even expect an answer." (*People v. Chatman* (2006) 38 Cal.4th 344, 384.) "An argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper because it does not seek to elicit relevant, competent testimony, or often any testimony at all." (*Ibid*.)

We agree with Nanez that the prosecutor's statements, "Convenient," "No, you're speaking when you're trying to help your friend get off" and "There's another lie" did not seek to elicit relevant testimony and were improper. The trial court properly sustained defense counsel's objections and struck the prosecutor's comments. We agree with the trial court, however, that this did not rise to the level of misconduct. The prosecutor did not, for example, imply facts that fell outside the evidence. (Cf. *People v. Earp* (1999) 20 Cal.4th 826, 860 ["For a prosecutor's question implying facts harmful to the defendant to come within this form of misconduct …, the question must put before the jury information that falls outside the evidence and that, *but for the improper question*, the jury would not have otherwise heard."].)

Moreover, Nanez cannot establish prejudice. Two victim eyewitnesses identified Nanez as the shooter. Davis identified Nanez as the shooter. Alles said that Davis told her he was alone, but many witnesses, including neighbors, saw two men running after the shooting. Given the state of the evidence, it is not reasonably probable Nanez would

have obtained a more favorable result had the prosecutor not made the objectionable comments about Alles's veracity. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133.)

## IV. *Cumulative error*

Nanez contends that that the cumulative effect of the alleged errors at trial rendered the proceedings fundamentally unfair. We disagree. "We have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial. We reach the same conclusion with respect to the cumulative effect of any assumed errors." (*People v. Sapp* (2003) 31 Cal.4th 240, 316.)

## V. *Abstract of judgment*

Finally, Nanez asserts the abstract of judgment must be corrected to indicate that the sentence for count 4 is stayed. The People agree. At sentencing, the trial court imposed an indeterminate term of 40 years to life for count 4 and announced the term was to be stayed pursuant to section 654. The minute order correctly reflects that the term for count 4 was to be stayed. The abstract of judgment, however, does not so indicate. In addition, the People point out that the court's order that the terms for counts 2 and 3 were to be served consecutively is not reflected on the abstract of judgment.

Accordingly, we order the court to correct the abstract of judgment to reflect that the terms for counts 2 and 3 are to be served consecutively and the term for count 4 is to be stayed. (*People v. Mesa* (1975) 14 Cal.3d 466, 471-472; *People v. Mitchell* (2001) 26 Cal.4th 181, 185-188.)

30.

## ***DISPOSITION***

The judgment is corrected to reflect that the terms for counts 2 and 3 are to be served consecutively and the term for count 4 is to be stayed. The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

_____

Kane, J.

WE CONCUR:

_____

Levy, Acting P.J.

_____

Franson, J.